IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| Robin Swinnea, § | |
| § | |
| *Plaintiff,* § | |
| § | |
| vs. § | Civil Action No.   6:20-cv-9 |
| § | |
| General Motors, LLC, § | |
| § | |
| *Defendant.* § | |

## PLAINTIFF'S COMPLAINT

**To the Honorable United States Judge of Said Court:**

COMES NOW, Robin Swinnea (hereinafter referred to as "Plaintiff"), and respectfully files this Complaint against General Motors, LLC (hereinafter referred to as "Defendant"), and in support hereof would state and show the following:

### I. Parties

1. Plaintiff Robin Swinnea is the biological mother of Shelby Swinnea, deceased. She resides in and is a citizen of Marlin, Texas.

2. Defendant General Motors, LLC is a Delaware limited liability company with its principal place of business in Michigan. Its sole member is General Motors Holdings LLC, a Delaware limited liability company with its principal place of business in Michigan. General Motors Holdings LLC's sole member is General Motors Company, a Delaware corporation with its principal place of business in the

Michigan. Service of process upon this Defendant may be had by serving its registered agent for service, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701-4234.

### 3. II. Jurisdiction

4. This Court has jurisdiction over the lawsuit under the provisions of 28 U.S.C. Section 1332.

5. The parties to this lawsuit are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

### III. Facts

6. On or about October 9, 2018, Shelby Swinnea was driving a 2016 Chevrolet Camaro (VIN# 1G1FB1RSXG0176538)("subject vehicle") traveling westbound on US Highway 84 in McLennan County, Texas.

7. The subject vehicle was designed by Defendant.

8. The subject vehicle was manufactured by Defendant.

9. The subject vehicle was marketed by Defendant.

10. The subject vehicle was also assembled and tested by Defendant.

11. For unknown reasons, control of the subject vehicle was lost, causing a collision with another vehicle.

12. At the time of the accident, Shelby Swinnea was properly seated and properly wearing the available seat belt.

13. However, despite being properly seated and properly wearing the available seat belt, Shelby Swinnea sustained fatal injuries when the vehicle failed to protect her because it violated several crashworthiness principles.

14. There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

   1. maintain survival space;

   2. provide proper restraint throughout the entire accident;

   3. prevent ejection;

   4. distribute and channel energy; and

   5. prevent post crash fires.

15. When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

16. The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

17. Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails.

18. Vehicle manufacturers have known for decades and have admitted under oath that there is a distinction between the cause of an accident versus the cause of an injury.

19. Indeed, vehicle manufacturers have known for decades that crashworthiness is the science of preventing or minimizing injuries or death **following** an accident through the use of a vehicle's various safety systems.

20. Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle."

21. General Motors has stated in the past that, "The rich don't deserve to be safer … Isn't it time we realized safety is not just for the pampered and the privileged? Safety is for all."

22. Volvo has stated that it has a goal that no one is killed or injured in a Volvo vehicle by the year 2020. Volvo has also stated that, "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute and activate."

23. Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are basically known today, it is incumbent upon auto manufacturers to investigate and find out what other automakers are doing with regards to safety and to apply those same methods or technology to their own vehicle. Furthermore, an automaker cannot

choose to use safer technology in Europe, Australia, Japan, or some other country and refuse or fail to offer that same safety technology to consumers in America.

24. It is further incumbent upon auto manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades and decades of vehicle design, testing, and reverse engineering of other manufacturers' vehicles.

25. In fact, insofar as society permits vehicle manufacturers to operate in such a way that they are permitted to sell highly complex, potentially dangerous, and also potentially highly profitable products on the market, manufacturers have a duty to do their very best to ensure that the vehicle will not be harmful to buyers, their households, or third parties.

26. This is cemented by the fact that every state of the United States has case law which holds that every person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others.

27. Most (if not all) engineering associations in the United States (and around the world) have a code of ethics. The number 1 fundamental canon of ethics for almost all engineers is to "hold paramount the safety, health, and welfare of the public." Accordingly, since paramount means "superior to all others", all vehicle engineers have to hold the safety, health, and welfare of the public as their highest considerations when they design vehicles.

28. Although it is true that there are minimum performance standards which an automaker is supposed to meet before selling a vehicle in the United States (the FMVSS), these minimum performance standards do not adequately protect the

public.

29. Indeed, Joan Claybrook, former administrator of the NHTSA, wrote a letter to major auto makers where she said, "Our federal safety standards are and were intended by Congress to be minimum standards. The tragedy is that many manufacturers have treated the standards more like ceilings on safety performance rather than floors from which to improve safety."

30. Additionally, in September of 2014, a Congressional report was issued in response to the General Motors ignition switch recall. The report questioned whether NHTSA had the technical expertise, culture and analytic tools needed to address safety issues. The report stated, "NHTSA also lacked the focus and rigor expected of a federal safety regulator". It was also stated that NHTSA staff has a "lack of knowledge and awareness regarding the evolution of vehicle safety systems they regulate."

31. Thus, it is clear that a prudent manufacturer's research and analysis should not stop with standards compliance. When it knows—or, through reasonable diligence, should know—that a product design presents a latent hazard or foreseeable risk of injury, it should go above and beyond the minimum requirements set forth in mandatory standards, rules, and/or regulations.

### IV. Cause(s) of Action as to Defendant

32. It was entirely foreseeable to and well-known by Defendant that accidents and incidents involving its vehicles, such as occurred herein, would on occasion take place during the normal and ordinary use of said vehicle.

33. The fatal injuries complained of occurred because the vehicle in question was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable, accidents. The vehicle in question was unreasonably dangerous in the event it should be involved in an incident such as occurred herein.

34. Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question.

35. As detailed herein, the vehicle contains and/or Defendant has committed either design, manufacturing, marketing, assembling, and/or testing defects.

36. Defendant either knew or should have known of at least one safer alternative design which would have prevented the fatal injuries to Shelby Swinnea.

37. The vehicle was defective and unreasonably dangerous, the Defendant was negligent, the Defendant misrepresented the safety and quality of its vehicles to lure consumers into buying GM vehicles, breach of warranties and Defendant violated consumer expectation in the following, non-exhaustive list of ways:

    a) Defendant markets itself as the industry leader in vehicle safety, vehicle testing, using state of the art engineering, testing and material, yet the facts prove otherwise;
    b) Defendant claims in its ads, marketing literature and commercials:
        a. Everyone deserves a safe vehicle;
        b. Safety is our main priority;
        c. Protecting you and your family is our foremost priority;
        d. GM uses state of the art safety systems to protect you and your family when accidents happen;
        e. GM is the leader in developing and implementing occupant protection systems so that you and your family will walk away from an accident;

      f. GM has rededicated itself to restoring confidence in our brand so we are going to have to build better, safer vehicles from anyone else in the world;

      g. One death is too many if we could have prevented the death.

c) The vehicle violated principles of crashworthiness;

d) The vehicle failed to provide proper restraint;

e) The vehicle failed to keep the occupant in her optimum seating position;

f) The vehicle's head restraint separated;

g) The vehicle failed to prevent restrained, far side occupant rollout;

h) The vehicle failed to contain center mounted airbags that have been used by GM since 2013;

i) The vehicle failed to use long duration side curtains to counter occupant rebound;

j) The vehicle failed to use reverse geometry seatbelts to prevent belt rollout;

k) The restraint system failures lead to atlanto occipital disarticulation;

l) The vehicle was not properly tested;

m) The restraint system was not properly tested;

n) The vehicle and restraint system failed to provide reasonable occupant protection;

o) The restraint system failed to work together with the other safety systems of the vehicle;

p) The marketing material, ads and commercials were prepared at the direction of GM to entice consumers to buy GM vehicles;

q) Consumers rely on marketing material, ads and commercials when they buy a GM vehicle;

r) Many of GM's marketing campaigns are not vehicle specific but talk about safety, testing and engineering in general terms;

s) GM failed to conduct rigorous engineering analysis to ensure vehicle safety and occupant protection;

t) Consumers expect GM to use state of the art safety, testing and engineering considering GM's marketing campaigns;

u) GM violated express and implied warranties about the safety of the vehicle;

  v) The design defects, negligence, marketing defects, misrepresentations, breach of warranties and violations of consumer expectations were the direct, producing, substantial, and/or proximate cause of the fatal injuries and damages in question. Defendant was also negligent in the design, manufacture, assembly, marketing, and/or testing of the vehicle in question.

38. In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death.

39. Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

40. If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

41. If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

42. A company that does not conduct a proper engineering analysis that would help it to identify potential risks, hazards, and/or dangers that could seriously or fatally injure someone is negligent.

43. Based upon information and/or belief, Defendant either used or knew about advanced safety features used in Europe, Australia, Japan and some other country and chose not to offer those safety features to American consumers.

44. Defendant's occupant protection philosophy and design philosophy are utilized in various model vehicles, including ones sold overseas in other markets.

45. When Defendant designed the subject vehicle, it did not reinvent the wheel. Defendant used an enormous amount of human capital which had been acquired from

numerous different engineers which had worked on many prior vehicle. This knowledge would have been utilized in different aspects of the various designs of the subject vehicle.

46. Defendant is currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the vehicle in question. Defendant is also in possession of what, if any, engineering analysis it performed.

47. However, it is expected that after all of these materials are produced in discovery and/or after Defendant's employees and corporate representatives have been deposed, additional allegations may come to light.

48. Lastly, the materials from other models, years, and countries will provide evidence regarding what Defendant knew, when they knew it, and about what was utilized or not utilized as well as the reasons why.

49. The foregoing acts and/or omissions, defects, and/or negligence of Defendant were the producing, direct, proximate, and/or legal cause of Shelby Swinnea's fatal injuries and Plaintiff's damages.

## V. Damages to Plaintiff

50. Plaintiff has endured and will continue to endure mental anguish, emotional distress and a loss of consortium as a result of the death of Shelby Swinnea.

51. Plaintiff has become obligated to pay reasonable and necessary funeral and burial expenses as a result of the death of Shelby Swinnea.

52. The above and foregoing acts and/or omissions of the Defendant, resulting in the fatal injuries to Shelby Swinnea, has caused actual damages to Plaintiff in excess of the minimum jurisdictional limits of this Court.

## VI. Prayer

53. For the reasons presented herein, Plaintiff prays that Defendant be cited to appear and answer, and that upon a final trial of this cause, Plaintiff recovers judgment against Defendant for:

   a. actual damages;
   b. prejudgment and post-judgment interest beginning October 9, 2018;
   c. costs of suit; and
   d. all other relief, general and special, to which Plaintiff is entitled to at law and/or in equity, and/or which the Court deems proper.

Respectfully submitted,

**The TRACY firm**

  /s E. Todd Tracy
E. Todd Tracy (Lead Counsel)
State Bar No. 20178650
TTracy@vehiclesafetyfirm.com
Andrew G. Counts
State Bar No. 24036408
ACounts@vehiclesafetyfirm.com
Wendell P. "Chip" Martens, Jr.
State Bar No. 24002528
CMartens@vehiclesafetyfirm.com
4701 Bengal Street
Dallas, Texas  75235
(214) 324-9000 – Phone
(972) 387-2205 – Fax

**Attorneys for Plaintiff**